**NATIONAL ASSOCIATION FOR BETTER BROADCASTING, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**KCOP Television, Inc., Intervenor.**

**No. 77–1152.**

United States Court of Appeals, District of Columbia Circuit.

Argued 5 June 1978.

Decided 2 Nov. 1978.

Jeffrey H. Olson, Cleveland, Ohio, with whom Jerome E. Weinstein, Beverly Hills, Cal., was on the brief, for appellant.

Diana L. Evans, Counsel, F. C. C., Washington, D.C., with whom Daniel M. Armstrong, Associate Gen. Counsel, Washington, D.C., were on the brief, for appellee.

Gardner F. Gillespie, Washington, D.C., with whom Howard F. Roycroft, Richard S. Rodin, and Gary V. Dixon, Washington, D.C., were on the brief, for intervenor.

Also Charles M. Firestone and Edward J. Kuhlmann, Washington, D.C., entered appearances for appellant.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

WILKEY, Circuit Judge:

This is an appeal from a decision of the Federal Communications Commission (FCC) to renew the broadcast license of KCOP Television, Inc., Channel 13 in Los Angeles.[1] Appellant, National Association for Better Broadcasting (NABB), had filed a petition to deny KCOP's renewal application, alleg-ing various program deficiencies and breaches of representations made to the FCC.[2] NABB contended that the alleged conduct fairly precluded a finding that renewal of KCOP's license would be in the public interest. The Commission disagreed and renewed the license without a hearing. Although the Commission was regrettably elliptical in disposing of certain allegations contained in the petition to deny, we cannot say that it acted unreasonably. We share, however, petitioner's distress at the occasionally garbled rationale which the Commission constructed, and our affirmance is consequently somewhat reluctant.

## I. BACKGROUND

KCOP filed its application for renewal of license on 30 July 1974. On 1 November 1974 NABB filed a petition to deny KCOP's application, alleging, *inter alia*, (1) deficiencies in seventeen areas of KCOP's programming, (2) failure to ascertain and meet the needs of the Los Angeles community, (3) violations of FCC rules through the misclassification of programs and various acts of "deception", and (4) breaches of an agreement KCOP had made with a Los Angeles citizens group and incorporated into its 1971 renewal application.

The Commission denied NABB's petition and declined to hold an evidentiary hearing on the renewal application, finding that NABB had failed to raise any substantial and material question of fact or to present *prima facie* evidence that license renewal would not be in the public interest.[3] Because the Commission necessarily found affirmatively that renewal would be in the public interest, it granted KCOP's application.

## II. STATUTORY FRAMEWORK

■ The Commission's disposition of license applications is governed by section

---

1. *KCOP Television, Inc.*, 59 F.C.C.2d 1321 (1976), *reconsideration denied*, 62 F.C.C.2d 93 (1977). The jurisdiction of this court was properly invoked pursuant to 47 U.S.C. § 402(b)(6) (1976).

2. The Petition to Deny is reproduced in the Joint Appendix (J.A.) at 1.

3. 59 F.C.C.2d at 1333.

309(d) of the Communications Act of 1934.[4] Section 309(d) provides that the FCC shall grant or renew a license if it finds, after considering the application and all pleadings submitted, that there "are no substantial and material questions of fact and that a grant of the application would be consistent with [the public interest]."[5] Any "party in interest" objecting to the renewal may file a petition to deny.[6] A petitioner's allegations must be both "substantial and specific,"[7] sufficient "to show that . . . a grant of the application would be *prima facie* inconsistent with [the public interest];"[8] "allegations of ultimate, conclusionary facts or more general allegations on information and belief, supported by general affidavits . . . are not sufficient."[9] Where the Commission finds that such a showing has not been made, it may refuse the petition, "issu[ing] a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition."[10]

▮ Aside from the sufficiency of the petition to deny, a hearing will not be required where the facts are undisputed,[11] and the "disposition of [an appellant's claims [turn] not on determination of facts but inferences to be drawn from those facts."[12] Finally, a hearing is not required to resolve issues which the Commission finds are either not "substantial" or "material," whether or not the underlying facts are disputed.[13]

▮ This court has recently had occasion to consider the special circumstances presented by allegations of discrimination in a licensee's employment practices. In *Bilingual II*,[14] we restated that proven intentional discrimination would put seriously into question a licensee's character qualifications. Allegations of such practices are to be tested against the usual statutory requirement of specificity and substantiality. We observed, however, that the peculiar difficulty of proof in such matters will alter the character of the evidence sufficient to warrant at least an inquiry by the FCC. Thus evidence of "substantial statistical disparity," without any direct evidence of actual discriminatory conduct, will ordinarily trigger the FCC's duty to inquire.[15] This is consistent with other instances in which the rigor of "well pleaded" allegations may be relaxed; as, for example, when relevant evidence is known only to the licensee.[16] The net result is that the provisions of section 309(d) are to be applied

**4.** 47 U.S.C. § 309(d) (1976).

**5.** 47 U.S.C. § 309(d)(2) (1976).

**6.** 47 U.S.C. § 309(d)(1) (1976).

**7.** *Alianza Federal De Mercedes v. FCC*, 176 U.S.App.D.C. 253, 257, 539 F.2d 732, 736 (1976); *Stone v. FCC*, 151 U.S.App.D.C. 145, 151, 466 F.2d 316, 322 (1972).

**8.** 47 U.S.C. § 309(d)(1) (1976).

**9.** S.Rep.No.690, 86th Cong., 1st Sess. 3 (1959), quoted in *Stone*, 466 F.2d at 322.

**10.** 47 U.S.C. § 309(d)(2) (1976).

**11.** *Stone*, 151 U.S.App.D.C. at 152, 466 F.2d at 323, *citing Marsh v. FCC*, 436 F.2d 132, 135–136 (1970).

**12.** *Alianza*, 176 U.S.App.D.C. at 257, 539 F.2d at 736; *Columbus Broadcasting Coalition v. FCC*, 164 U.S.App.D.C. 213, 217, 505 F.2d 320, 324 (1974); *Stone*, 151 U.S.App.D.C. at 152, 466 F.2d at 323; *Anti-Defamation League of B'nai B'rith v. FCC*, 131 U.S.App.D.C. 146, 148, 403 F.2d 169, 171 (1968), *cert. denied*, 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969).

**13.** *Stone*, 151 U.S.App.D.C. at 152, 466 F.2d at 323. *See id.* n.18, *quoting* H.Rep.No.1800, 86th Cong., 2d Sess. 12 (1960), *reprinted in* [1960] U.S.Code Cong. & Admin.News, p. 3520. *See also Mahoning Valley Broadcasting Corp.*, 39 F.C.C.2d 52, 63 (1972).

**14.** *Bilingual Bicultural Coalition v. FCC*, No. 75 1855 (D.C.Cir. 4 May, 1978) (rehearing *en banc*).

**15.** *Id.*, slip op. at 16.

**16.** This will be the case, for example, where licensee's financial condition is relevant to the public interest inquiry. *See Citizens Comm. to Save WEFM v. FCC*, 165 U.S.App.D.C. 185, 204–205, 506 F.2d 246, 265–66 (1974) (*en banc*). *Cf. Alianza*, 176 U.S.App.D.C. at 258, 539 F.2d at 737–738. In such cases the Commission's procedural response should be tailored to the circumstances; it might choose, *inter alia*, to direct a letter of inquiry to the licensee, see *Bilingual II*, slip op. at 17-18; to release confidential information, *see Alianza*, 176 U.S.App.D.C. at 258, 539 F.2d at 737; 47 C.F.R. § 0.461 (1977); to shift the burden of proof

pragmatically, with sensitivity both to the need for administrative economy and also to the varying nature of the relevant proof.

## III. ANALYSIS

We review the Commission's decision to determine if it reasonably concluded that there were no "substantial and material questions of fact" and that license renewal would be in the public interest.

■ The extent of our review in such cases as this is narrow. "We defer to the expertise and experience of the Commission within its field of speciality." [17] The decision whether to hold hearings "is a matter in which the Commission's discretion . . is paramount." [18] Although we must be satisfied that the Commission took a hard look at all the relevant issues,[19] if the Commission's action was not arbitrary, capricious or unreasonable, we must affirm.[20]

We now address the FCC's disposition of the allegations raised by NABB in its petition to deny, which may be conveniently grouped as programming criticisms and a failure to implement the CORT agreement as represented to the FCC.

### A. *Programming Criticisms*

■ NABB extensively criticized the quality of KCOP's programming generally and cited particular areas of alleged deficiency.[21] These allegations were of three types: (1) that the quality of certain program areas was inferior; (2) that programming ignored certain community needs; and (3) that particular programming was offensive. Within the first category are the allegations that KCOP's programming is overly commercialized, that news programming is largely of a perfunctory "rip and read" variety, that there is too little local programming, that public affairs programming is "cheap, shoddy, and ineffectual," and that there is an excessive amount of "old and stale programming." The Commission correctly concluded that such generalized criticisms, about matters typically consigned wholly to the discretion of the licensee, were irrelevant to the inquiry.[22] As we have recently observed:

[t]he Commission simply determines whether the licensee has operated in the public interest in the past, and whether its proposed programming makes it likely to operate in the public interest in the future. Once that determination is made the Commission does not try to evaluate whether the licensee could have done a better job of operating in the public interest.[23]

Thus we have no doubt that the Commission reasonably found appellant's allega-

to the licensee, *see Citizens Comm. to Save WEFM*, 165 U.S.App.D.C. at 204, 506 F.2d at 265; or to permit limited pre-hearing discovery. *But see Citizens Communication Center*, 61 F.C.C.2d 1112, 1125–1127 (1976); 47 C.F.R. § 1.311 (1977) (discovery available only after a license renewal application has been designated for a hearing).

17. *Stone*, 151 U.S.App.D.C. at 151, 466 F.2d at 322, *quoting West Michigan Telecasters, Inc. v. FCC*, 130 U.S.App.D.C. 39, 42, 396 F.2d 688, 691 (1968). *See also Southwestern Operating Co. v. FCC*, 122 U.S.App.D.C. 137, 138, 351 F.2d 834, 835 (1965) (there is "no doubt that Congress intended to vest in the FCC a large discretion to avoid time-consuming hearings in this field whenever possible, and we would ordinarily defer to that purpose").

18. *Columbus Broadcasting*, 164 U.S.App.D.C. at 217, 505 F.2d at 324.

19. *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 395, 444 F.2d 841, 853 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

20. *Nat'l Org'n for Women v. FCC*, 181 U.S. App.D.C. 65, 68, 555 F.2d 1002, 1005 (1977); *Columbus Broadcasting*, 164 U.S.App.D.C. at 217, 505 F.2d at 324.

21. These contentions are set out in the Petition to Deny, J.A. at 5–93, and are summarized in the Brief of Appellant at 33–36.

22. 59 F.C.C.2d at 1328 (over-commercialization); *id.* at 1329 (news); *id.* at 1330 (public affairs); *id.* at 1331–1332 (local programming); *id.* at 1332 ("old and stale" programming).

23. *Alianza*, 176 U.S.App.D.C. at 258, 539 F.2d at 737. Of course in this case, apart from its finding that NABB's allegations were insufficient to show *prima facie* to the contrary, the Commission affirmatively found that renewal would be in the public interest. 62 F.C.C.2d at 96. We believe, for reasons which owing to the

tions so imprecise and unspecific as to be irrelevant to the issue of renewal.

The allegations within the second category are at least not facially immaterial to the public interest inquiry, referring as they do to the FCC's ascertainment requirement.[24] Thus NABB alleges that KCOP has ignored the special needs of children and minorities, has produced no specialized agricultural programming, and has aired only imbalanced religious programming, too little news and too many commercials.[25]

■ The ascertainment requirement is a sensible means of assuring that licensees obtain the sort of information which may make diversity of expression more likely. Imposing such duties of inquiry without more appears to raise no First Amendment questions, since they do not directly regulate protected speech. When the FCC scrutinizes programming content to determine if it is responsive to ascertained needs, or employs programming "guidelines" in processing renewal applications, arguably it is on more delicate ground.[26] Despite NABB's contention that enough was not done, we think the Commission's depth of inquiry in this noncomparative renewal proceeding was sufficient to sustain its finding that KCOP's programming had amply met the ascertained needs of the community[27] and had satisfied the percentage guidelines for various program types.[28] We recognize, of course, that a more thorough inquiry into program content would be necessary in comparative licensing proceedings, where making a minimally rational choice would suppose some programming comparison.[29]

■ The third category of appellant's allegations are those objecting to specific programs. Of course, not all speech is protected by the First Amendment and conduct which is otherwise unlawful is not immunized when put on television. Certain of NABB's allegations did pertain to arguably unlawful conduct. Thus NABB alleged (1) that airing certain game shows constituted the unlawful broadcast of lotteries;[30] (2) that *Championship Wrestling* violated various California athletic rules;[31] and (3) that certain faith healing programs were fraudulent.[32] We believe that the Commission reasonably found the allegations insufficient to show *prima facie* any illegality.[33]

character of this appeal appear interstitially in this opinion, that it was not unreasonable to find renewal would be in the public interest.

24. *See Primer on Ascertainment of Community Problems by Broadcast Renewal Applications*, 57 F.C.C.2d 418 (1976); *NOW*, 181 U.S.App. D.C. at 68–69, 555 F.2d at 1005–1006; *Alianza*, 76 U.S.App.D.C. at 258, 539 F.2d at 737.

25. Brief of Appellant at 34–36.

26. *See Alianza*, 176 U.S.App.D.C. at 257, 539 F.2d at 736; *Citizens.Comm. to Save WEFM*, 165 U.S.App.D.C. at 207, 215–216, 506 F.2d at 268, 276–277 (Bazelon, C. J., concurring in the result).

27. *See* 59 F.C.C.2d at 1324–1325 (children's programming); *id.* at 1326–1327 (minority programming); *id.* at 1331 (agricultural programming). Furthermore, as we have noted, it is not essential that a licensee respond to every ascertainable need, only that it determine in good faith which merit treatment. *See Alianza*, 176 U.S.App.D.C. at 258, 539 F.2d at 737; *Newton Broadcasting Corp.*, 56 F.C.C.2d 82, 88 (1975); *Taft Broadcasting Co.*, 38 F.C.C.2d 770, 790 (1973); *Primer on Ascertainment of Community Problems*, 27 F.C.C.2d 650, 673 (1971).

28. *See* 59 F.C.C.2d at 1328 (news); *id.* at 1330 (public affairs); *id.* (instructional programming); *id.* at 1331 (local). The relevant data, compiled from filings with the FCC, are set out in the Brief of FCC at 21 n. 14. *See also Programming Policy Statement*, 44 F.C.C.2d 2303, 2314 (1960); 47 C.F.R. § 73.670 n. 1 (1977).

29. *See, e. g., Central Florida Enterprises, Inc. v. FCC*, No. 76–1742 (D.C.Cir. 25 Sept. 1978); *Fidelity Television, Inc. v. FCC*, 169 U.S.App. D.C. 225, 515 F.2d 684, *cert. denied*, 423 U.S. 926, 96 S.Ct. 271, 46 L.Ed.2d 253 (1975). *Cf. Citizens Comm. to Save WEFM*, 165 U.S.App. D.C. at 207, 217, 506 F.2d at 268, 278 (Bazelon, C. J., concurring in the result) (intrusions into licensee's programming discretion unjustified outside of comparative context).

30. Petition to Deny, J.A. at 63–68.

31. *Id.* at 13–17.

32. *Id.* at 26–31.

33. *See* 59 F.C.C.2d at 1327–1328 (lotteries); *id.* at 1321–1322 (wrestling); *id.* at 1324 (faith-healing). Of course an adequate showing of

Other of NABB's allegations concern programs whose content, although not unprotected by the First Amendment, is arguably regulatable in the public interest. NABB contends that: (1) KCOP violated the "fairness doctrine" and "personal attack" rules;[34] and (2) some of KCOP's programs are excessively violent, particularly when children might be expected to be viewing.[35]

As to the fairness doctrine and personal attack allegations, the Commission reasonably found that no violations had been shown to have occurred.[36] Had there been some showing of a violation of either rule, it would have been appropriate to review the licensee's conduct, likely in the context of a hearing.[37]

The allegations concerning excessive violence are on quite a different footing; the conceptual difference between them and alleged violations of the fairness doctrine is instructive. To be sure, *both* allegations depend upon the *content* of speech. The

difference is that in one case, regulation generates diversity of expression, only incidentally and marginally displacing some of the licensee's speech, and that *without regard to its content.*[38] In the other case regulation would plainly suppress expression based on its supposedly offensive content.

Such subsequent review of program content as is proposed by appellant is not "censorship" within the meaning of 47 U.S.C. § 326.[39] Furthermore, this last term the Supreme Court did uphold the FCC's authority pursuant to statute to impose sanctions upon a licensee for a broadcast that was "indecent *but not obscene.*"[40] The FCC arguably could have conducted an inquiry here as to the violent content of programming, but it chose not to do so. We hold only that the Commission did not abuse its discretion in declining to pursue appellant's allegations of excessive violence in programming on the facts of this case.[41]

illegality would be quite relevant, see *Uniform Policy as to Violation by Applicants of Laws of United States,* 42 F.C.C.2d 399 (1951); but the Commission must be in possession of sufficient facts showing that the applicant has violated the law. See *Sumiton Broadcasting Co.,* 15 F.C.C.2d 410, 412 (Rev.Bd.1968).

We note the special difficulties attending the allegation of fraudulent religious programming. While it is probable that speech enjoys no heightened protection merely if its content is religious, and it is quite clear that religious fraud is not protected by *any* clause of the First Amendment, inquiries into religious fraud must scrupulously avoid becoming inquisitions into the sincerity of religious belief. It will thus ordinarily be necessary to rely on extrinsic evidence of fraud in such cases. Consequently, the dismissal of the allegations here as insufficiently specific was clearly reasonable.

**34.** Both violations were alleged to arise from the broadcast of a single program. Petition to Deny, J.A. at 26–29.

**35.** *Id.* at 46–60.

**36.** With respect to the fairness doctrine allegation, it was apparently undisputed that KCOP had aired a program presenting views contrasting those presented on the show referred to by NABB. 59 F.C.C.2d at 1324. The Commission had rejected the personal attack issue raised by NABB when it had been previously raised by another complainant. *Id.* at 1323–1324.

**37.** See, e. g., *Brandywine-Main Line Radio, Inc. v. FCC,* 153 U.S.App.D.C. 305, 350, 473 F.2d 16, 61 (1972), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973).

**38.** Permissible content-based regulations of programming usually have been of this sort. Such intrusions are predicated on the physical scarcity of the broadcast spectrum and ordinarily attempt to repair rather narrow failures of diversity. See, e. g., *Brandywine-Main Line Radio, Inc.,* 153 U.S.App.D.C. at 338, 350, 473 F.2d at 49, 61 (fairness doctrine and personal attack rule); *Banzhaf v. FCC,* 132 U.S.App. D.C. 14, 34, 405 F.2d 1082, 1102 (1968) (upholding FCC ruling requiring "equal time" for anticigarette advertising), *cert. denied,* 396 U.S. 842 (1969).

**39.** *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

**40.** *Id.,* 438 U.S. 748–751, 98 S.Ct. 3040-3041 (emphasis added).

**41.** Whether such a regulation of speech because of its content would ever be permissible without some "clear statement" as was provided by statute in *Pacifica* is a difficult question not now before us. See 18 U.S.C. § 1464 (1976) (forbidding the broadcast of "any obscene, indecent, or profane" language.) *Compare Greene v. McElroy,* 360 U.S. 474, 507, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

### B. *The CORT Agreement*

Several of appellant's allegations pertain to a 1971 agreement between KCOP and a citizens group called Council on Radio and Television (CORT). CORT had opposed KCOP's 1971 license renewal, but withdrew its petition to deny when the agreement at issue here was filed as an amendment to KCOP's renewal application. NABB alleged that KCOP violated the agreement in three respects: (1) that it failed to "remove all racial and ethnic slurs" from its programming;[42] (2) that it failed to "carry a locally produced religious program representing the major American Religious denominations";[43] and (3) that it had failed to produce a monthly "documentary type" program dealing with minority affairs.[44]

It is settled that programming proposals contained in a private agreement which is incorporated within a license application become representations to the Commission and are treated as are other promises of future performance.[45] Thus a licensee is obliged to comply substantially with its proposals or to justify any substantial variations.[46] Insubstantial variations do not ordinarily raise a question of the licensee's ability to operate in the public interest.[47] Moreover, modifications of the proposals may be warranted in light of the non-static character of community needs.[48]

The Commission confines its review to determining if the licensee has made "reasonable and good faith efforts to effectuate its proposals."[49] This is not to say that the Commission's review is unexacting. The Commission properly takes such proposals seriously, and evidence of bad faith or of insubstantial performance would be quite material to a renewal inquiry.[50] This is fitting in light of the utility of public reaction in regulating televised speech comfortably within the First Amendment. Private agreements afford a rough way to accommodate "the public's right to hear" with the licensee's otherwise broad programming discretion, without implicating the government in the actual choice of content. The same rationale underlies the FCC's reliance on viewer-initiated complaints as the vehicle for enforcing the fairness doctrine.[51]

The Commission dismissed NABB's allegations pertaining to the CORT agreement, finding that they failed to show any of the purported violations. With respect to the claim that KCOP had breached its promise to remove all racial and ethnic slurs from its programming, the Commission said that NABB's allegations were not specific enough; that in any event characterization of language as a racial slur was "merely a matter of subjective interpretation," and that accordingly it would not "arbitrate the definition of vague terms" which "fairly lend themselves to varying interpretations." Moreover, inasmuch as the standard of compliance is reasonableness and good faith the Commission concluded it "could hardly be said . . . that KCOP failed to meet that standard."[52]

NABB attacked the Commission's alternative findings as both wrong and mutually inconsistent. It was logically impossible, NABB supposed, to find compliance with an agreement which the Commission would not

**42.** Petition to Deny, J.A. at 17.

**43.** *Id.* at 19–21.

**44.** *Id.* at 80.

**45.** *Agreements Between Broadcast Licensees and the Public,* 57 F.C.C.2d 42, 54 (1975) [hereinafter cited as *Agreements* ].

**46.** *Id.*

**47.** *RadiOhio, Inc.,* 38 F.C.C.2d 721, 743 (1973), aff'd sub nom. *Columbus Broadcasting Coalition v. FCC,* 505 F.2d 320 (1974).

**48.** *See Agreements,* 57 F.C.C.2d at 49. *Cf. American Federation of Musicians v. FCC,* 356 F.2d 827, 833 (1966).

**49.** *Agreements,* 57 F.C.C.2d at 52.

**50.** *See, e. g., Columbus Broadcasting Coalition,* 164 U.S.App.D.C. at 219, 505 F.2d at 326; *Brandywine-Main Line Radio, Inc.,* 153 U.S. App.D.C. at 339, 473 F.2d at 50–52.

**51.** *See Fairness Report,* 48 F.C.C.2d 1, 8 (1974).

**52.** 59 F.C.C.2d at 1322; 62 F.C.C.2d at 94.

interpret. Consequently, NABB believed that a hearing was essential to resolve the factual question of the intent of the parties to the CORT agreement. To bolster its request for a hearing, NABB adduced some evidence that KCOP had persisted in precisely those practices to which the racial slur provisions arguably were addressed.[53]

■ We agree that the Commission's treatment of this issue was muddled. Further, we believe that under some circumstances, not presented by this case, it would have been impermissible to decline to interpret such a representation made by a licensee. But on the record in this case it is apparent that the instances of alleged racial slurs adduced by appellant were infrequent and insubstantial. Further, such offensive language as was shown is just part and parcel of the hyperbole and pseudoanimosity which has always characterized "professional wrestling." It is unfortunate that the Commission did not address the substantiality of appellant's allegations more plainly, but we think it did at least intimate the view in finding good faith compliance:

> [T]he standard by which a licensee is judged concerning its compliance with such agreements is whether it made reasonable and good faith efforts to effectuate its proposals, and it can hardly be said from the allegations of NABB's original pleadings that KCOP failed to meet that standard.[54]

Thus it was reasonable to find that appellant's allegations were simply not substantial enough to warrant further inquiry, and on this basis, articulated as it was, we can sustain the Commission.

NABB was similarly troubled by the Commission's disposition of its remaining contentions. NABB had included in its petition to deny, together with allegations of KCOP's general neglect of minority interests, allegation that KCOP had failed to produce the monthly minority affairs documentary called for in the agreement. The agreement had provided:

> KCOP shall develop, finance, produce and present monthly, in its prime time "Big Question" or "Minority Community" regularly scheduled programs, a documentary type program which will feature interviews, film clips and commentary. This program will be produced and directed by KCOP in consultation with minority groups and will include the use of local minority talent in program production.[55]

NABB alleged that too few of the documentaries had been produced, and those without involving minorities. The Commission said that the allegations lacked "both specificity and factual support," some being based wholly on "information and belief" regarding matters not within NABB's personal knowledge.[56] Moreover, the relevant provisions in the agreement were "ambiguous," failing to state precisely the character of the intended programming. Although it was "unclear from the record whether licensee actually broadcast such a program," inasmuch as "overall minority programming" was adequate, the Commission found that KCOP had made a good faith effort to comply.[57]

■ Apparently the Commission was of the opinion that NABB's allegations, in light of KCOP's overall record of public affairs and minority programming, failed to raise a serious question whether renewal would be in the public interest. Consequently, the exact nature of the alleged variance from the CORT agreement (admittedly a factual question) became irrelevant. Had the Commission said this more plainly, it would have avoided the awkwardness of admitting doubt concerning the occurrence of the programming specified in the agreement, while at the same time finding substantial compliance with that provision. The result reached by the Commission is,

---

**53.** See J.A. at 170–75.

**54.** 62 F.C.C.2d at 94.

**55.** CORT Agreement, paragraph III B, J.A. at 209–10.

**56.** 59 F.C.C.2d at 1330.

**57.** 62 F.C.C.2d at 95–96.

nevertheless, not unreasonable and we will not remand merely to obtain redrafted language which more precisely fits our own.

Finally, NABB alleged that KCOP breached its promise, contained in the CORT agreement, to broadcast balanced religious programming. Paragraph III F of the CORT agreement provided:

> F.  Religious Programs.
>
> 1.  In keeping with KCOP's efforts to cover the range of religious thought, KCOP will carry a locally produced religious program representing the major American religious denominations, which will include discussion of current issues, commentary, or religious music.[58]

In its first opinion the Commission found "that the terms of the CORT agreement now at issue have been met and that KCOP has provided balanced religious programming." The Commission said that KCOP had complied with the agreement in good faith through a public affairs program presenting "religious topics and speakers."[59] NABB disputed that a public affairs format could satisfy the agreement, especially in light of the fact that the Commission itself distinguished between categories of religious and public affairs programming.[60] The Commission declined, however, to infer "such a narrow intention" from the agreement's ambiguous language, especially in light of the substantial discretion in programming choice accorded licensees.

■ Again, the result reached by the Commission is not unreasonable, despite the obliqueness of its approach. The Commission described what it was doing in the language of contract interpretation, permitting NABB to counter with the allegation that the intention of the parties was in fact contrary; yet it is clear, though implicit, that the Commission concluded that the deviation from the promise, even as alleged, was insufficient to raise a substantial question of licensee integrity or capacity to broadcast in the public interest.

## IV.  CONCLUSION

In revising the procedures for opposing license renewals, Congress made clear its intention to eliminate wasteful inquiry into immaterial or insubstantial matters. However, summary process, without the safeguards of an adversarial proceeding, makes it even more essential that the Commission clearly state the reasons for its decision on the merits. That it was fairly unsuccessful in doing so in this case is troubling. The function of judicial review is enormously complicated by a failure of clarity on the part of the agency. Ordinarily the appropriate course will be to remand for some explication, for we cannot supply a rationale omitted by the agency. That course is just barely unnecessary in this case.

*Affirmed.*

---

58.  CORT Agreement, paragraph III F, J.A. at 211.

